38 F.3d 1220
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Susanna JOHNSON, Plaintiff-Appellee/Cross-Appellant,
v.
Joseph VELENCSICS, the unnamed legal representative for the
Estate of Joseph Yelecsics, now deceased,
Defendant-Appellant/Cross-Appellee.
 Nos. 92-5218, 92-5220.
 United States Court of Appeals, Tenth Circuit.
 Oct. 18, 1994.
 ORDER AND JUDGMENT[1]
 
 1
 Before HOLLOWAY and McKAY, Circuit Judges, and THEIS,[2] District Judge.
 
 
 2
 This prolonged action for an accounting of partnership interests between Susanna Johnson and Joseph Yelencsics--respectively, the Plaintiff and Defendant--returns to this court after a hiatus of some years. In 1989, by an Order and Judgment, we affirmed in part and reversed in part the initial accounting struck by the trial court, holding that it had improperly refused to consider the effect of two disputed transactions, the so-called "$650,000" and "$5,000,000" sales. We remanded with instructions to address the validity and implications of these two transactions. A second trial ensued, and a second accounting rendered. Each party now appeals some aspect of the outcome of that second trial. We affirm for substantially the reasons given by the district court.
 
 
 3
 This litigation arises from the lengthy and intricate relationship between the Susanna Johnson/Joseph Yelencsics partnership ("the partnership"), operating as the Honey Creek Ranch, and Johnson Farms of Mississippi, owned by Susanna Johnson's daughter and controlled by her husband, James. In a series of transactions negotiated in the early 1970s between James Johnson and Yelencsics, acting for Johnson Farms and the partnership respectively, the Honey Creek Ranch obtained cattle from Johnson Farms. Two such transactions remain in dispute:
 
 
 4
 (i) the "$5,000,000 sale," which, from 1973 to 1975, brought a disputed number of cattle of disputed quality to the Honey Creek Ranch for an alleged price of $5,000,000;
 
 
 5
 (ii) the "$650,000 sale," a 1973 purchase by the partnership of 200 head of registered Charolais cattle from Johnson Farms for $1,000,000, of which $650,000 purportedly remained due upon the termination of the partnership. Susanna Johnson contends that she alone satisfied both of these partnership obligations[3] and that the final accounting must reflect her resulting contribution to the partnership. Mr. Yelencsics, in turn, contests the existence of the "$5,000,000 sale," argues that both debts have been extinguished by the running of the statute of limitations, and denies that Susanna Johnson actually paid either obligation.
 
 
 6
 The trial court resolved the extensive and conflicting evidentiary record as follows. The court concluded that in 1973 Johnson Farms of Mississippi sold the partnership 200 head of registered Charolais cattle, worth approximately $240,000. Their true value notwithstanding, these cattle were sold on credit to the partnership for $1,000,000. No time was fixed for complete satisfaction of the debt, and the resulting obligation, somewhat reduced by occasional partial payments, was carried on the partnership's books from 1973 until 1987, when the partnership was dissolved by Mr. Yelencsics's death. At that time, $650,000 remained to be paid on this debt.
 
 
 7
 The court next found that from 1973 to 1975 the partnership bought from Johnson Farms approximately 1400 additional head of cattle of varied quality, worth roughly $760,000. Mrs. Johnson alleges that these cattle formed the subject matter of the "$5,000,000 sale." The court, however, determined that no "$5,000,000 sale," as such, was ever agreed to by James Johnson and Joseph Yelencsics; rather, James Johnson arbitrarily ascribed a $5,000,000 purchase price--a figure set to maximize tax benefits--to the sequence of deliveries from 1973 to 1975.
 
 
 8
 Abandoning the somewhat illusory labels (the "$650,000 sale", the "5,000,000 sale") given these deliveries, the trial court attributed all of the 1600 head of cattle bought from Johnson Farms by the partnership between 1973 and 1975 to the single $1,000,000 contract reflected on the books of the partnership. Upon the dissolution of the partnership, $650,000 remained due upon this contract. The court ruled that the applicable statute of limitations had yet to run against this debt. Mrs. Johnson, as the surviving partner, therefore had the power to pay this obligation and the right to receive capital contribution credit for her payment. The court found that Mrs. Johnson had indeed satisfied this debt, and therefore increased her capital contribution to the partnership by $325,000. This adjustment to the accounting calculated in the first trial produced a $158,580.02 judgment favoring Mrs. Johnson. The court denied prejudgment interest.
 
 
 9
 On appeal, each party alleges factual and legal error by the trial court. Both parties argue that the trial court committed clear error in formulating its characterization of events. Mr. Yelencsics, in essence, contends that the partnership satisfied its debts to Johnson Farms and, in the alternative, denies that Mrs. Johnson ever paid any debt that may have existed. Mrs. Johnson, in turn, contests the value placed on the delivered cattle by the trial court. Furthermore, Mr. Yelencsics claims that the trial court erred in its interpretation of the applicable Oklahoma statute of limitations. Mrs. Johnson likewise appeals the denial of prejudgment interest.
 
 
 10
 Findings of fact are overturned for clear error only. Fed.R.Civ.P. 52(a); O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 901 (10th Cir.1992). "A finding of fact is not clearly erroneous unless 'it is without factual support in the record, or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made.' " Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir.1990) (quoting LeMaire ex rel. LeMaire v. United States, 826 F.2d 949, 953 (10th Cir.1987)). While the evidence in the record does not compel the findings reached by the trial court, its conclusions are neither unreasonable nor unsubstantiated, and we cannot therefore characterize its decision as clearly erroneous.
 
 
 11
 The parties complain of three main flaws in the trial court's resolution of the conflicting evidence. First, Mrs. Johnson disputes the court's evaluation of the worth of the cattle that form the subject matter of the "$650,000 sale" and the "$5,000,000 sale." Second, both parties take issue with the attribution to the $1,000,000 contract of all of the cattle delivered from 1973 to 1975. Third, Mr. Yelencsics denies that Mrs. Johnson ever paid any debt that the partnership may have owed Johnson Farms.
 
 
 12
 Filtering through the mass of evidence introduced during the two trials, the trial court found that: (1) the 200 head of Charolais cattle that were indisputably delivered to the Honey Creek Ranch in 1973 were worth roughly $240,000; (2) 1400 additional cattle, worth approximately $760,000, were delivered to the Honey Creek Ranch by Johnson Farms. Neither party disputes the delivery of the 200 Charolais. In pricing these cattle, the trial court relied upon plaintiff's expert testimony that set the price-per-head at $1000 to $1500. The court's determination of the number of additional cattle delivered to the Honey Creek Ranch stands midway between the estimates of the parties, who fiercely contested this point. The court's calculations are amply supported by the record.[4] The court's evaluation of the worth of these 1400 additional cattle likewise represents a mid-point estimate between the high and low expert valuations offered into evidence.[5]
 
 
 13
 While the trial court's computations are not beyond dispute, each element of these findings is firmly based in the admittedly conflicting evidence contained within the record. We cannot therefore hold its conclusions to be plain error. See Cooter & Gell v. Hartmax Corp., 496 U.S. 384, 400 (1990) ("In practice, the 'clearly erroneous' standard requires the appellate court to uphold any district court determination that falls within a broad range of permissible conclusions."); Schumacher v. United States, 931 F.2d 650, 652 (10th Cir.1991), cert. denied, 112 S.Ct. 1955 (1992).
 
 
 14
 Business transactions between Johnson Farms and the partnership were hardly paradigms of concrete documentation. It seems likely that the primary financial motivation lurking behind these deals was the Internal Revenue Code.[6] Confronted with inherently contradictory testimony about what was, in essence, a sequence of tax-avoidance transactions, the form of which was only tenuously linked to the reality, the trial court jettisoned the characterization of events alleged by the plaintiff and looked instead to the facts demonstrated at trial. Both parties acknowledged that the financial records of the partnership reflected a $1,000,000 contract between the partnership and Johnson Farms. Both parties acknowledged that a relatively large (if disputed) number of cattle were delivered to the Honey Creek Ranch from Johnson Farms; the court in turn found that 1600 head of cattle worth roughly $1,000,000 were in fact delivered. The court found, moreover, that no $5,000,000 sale of cattle, as such, was ever finalized because Mr. Yelencsics and Mr. Johnson could not agree upon a price. See Aplt.App. at 112-13, 133-34, 154-60. The court therefore reconciled the two findings of fact most substantiated by the record--roughly 1600 head of cattle worth roughly $1,000,000 were delivered to the Honey Creek Ranch from Johnson Farms; a $1,000,000 debt owed to Johnson Farms remained on the partnership's books from 1973 to 1987--by attributing all of the cattle at issue here to a single, $1,000,000 contract.
 
 
 15
 The parties argue that this recharacterization of these contested cattle transactions ignores our earlier mandate to consider the validity and effect of the "$650,000" and "$5,000,000" sales and impermissibly offsets an overpayment on the former sale with a failure to pay on the latter delivery. We disagree. As a review of the trial testimony plainly demonstrates, the form of Johnson/Yelenscics dealings was only loosely grounded in the actual location, ownership, and eventual fate of the relevant cattle. While other inferences might be drawn from the record, it was not clearly erroneous for the trial court to resolve these illusory, and contested, tax transactions with real events by pairing known cattle with an acknowledged contract. See Bill's Coal Co. v. Board of Pub. Util., 887 F.2d 242, 244 (10th Cir.1989) (district court need not be "correct," but its conclusion must be "permissible" in light of the evidence); cf. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").
 
 
 16
 Lastly, Mr. Yelencsics argues that, irrespective of the existence of any debt owed Johnson Farms by the partnership, Mrs. Johnson has not satisfied any such debt. This argument lacks cogency. At trial, Mrs. Johnson introduced a deposit slip that documents a $650,000 transfer from Mrs. Johnson to her daughter. While, given the Byzantine Johnson family accounting, no actual transfer of money may have occurred, Mr. Johnson testified that he considered all debts paid. See Cross-aplt. Supp.App. at 33-35. Confronted with evidence of payment and testimony indicating that the appropriate parties consider payment to have been made, we shall not overturn the trial court's finding. See Bill's Coal Co., 887 F.2d at 244.
 
 
 17
 The trial court held that the statute of limitations applicable to the $650,000 balance had not yet expired, notwithstanding the rather lengthy period since the creation of the debt. Mr. Yelencsics disagrees with this result.
 
 
 18
 Conclusions of law are reviewed de novo. EEOC v. Ackerman, Hood & McQueen, Inc., 956 F.2d 944 (10th Cir.1992); Northern Natural Gas Co. v. Grounds, 931 F.2d 678, 681 (10th Cir.1991). Under the U.C.C. as adopted by Oklahoma, a five-year statute of limitations governs the sale of goods. Okla. Stat. Ann. tit. 12A 2-725(1) (West 1988); Sesow v. Swearingen, 552 P.2d 705, 706-07 (Okla.1976). Written acknowledgment of an existing debt, if signed by the obligor, tolls the running of the statute of limitations. Okla. Stat. Ann. tit. 12 101 (West 1988); see also Victory Inv. Corp. v. Muskogee Elec. Traction Co., 150 F.2d 889 (10th Cir.), cert. denied, 326 U.S. 774 (1945). The books and records of a partnership are relevant evidence of an acknowledged existing debt. Cobb v. Martin, 123 P. 422 (Okla.1912); see also Billingslea v. Billingslea, 219 P.2d 989 (Okla.1950).
 
 
 19
 As recognized by the trial court, the obligation at issue here falls within 101. The financial records of the partnership carried the ongoing $650,000 debt from 1973 until September 1987. "It is not essential that the acknowledgment be expressly stated.... It is enough if language is used from which the acknowledgment may be fairly inferred. Neither is it obligatory that the acknowledgment be found in a single writing." Victory Inv. Corp., 150 F.2d at 891. No time had been set for payment of the debt. Yearly financial reports, signed by the partnership's authorized accountant and delivered both to Mr. Yelencsics and to the Johnsons,[7] continued to report the debt as an existing liability through at least 1985. Thus, the March 1989 payment made by Mrs. Johnson easily fell within the five-year statute of limitations.
 
 
 20
 As acknowledged by Mr. Yelencsics in his reply brief, Mrs. Johnson, as "winding up" partner, had the authority to pay any valid outstanding partnership debts and the right to receive capital credit for such payments, see Harris v. W.R. Hart & Co., 154 P.2d 759 (Okla.1944). We have affirmed the trial court's findings with respect to the existence and satisfaction of the debt. We agree with the trial court that the statute of limitations had not yet expired. Thus, we necessarily agree that the final accounting rendered in the first trial must be adjusted to favor Mrs. Johnson.
 
 
 21
 Mrs. Johnson appeals the trial court's denial of prejudgment interest. The trial court based the denial upon Harris v. W.R. Hart & Co., which followed the common law rule that disallowed interest until the striking of a balance. See Harris, 154 P.2d at 762. Mrs. Johnson argues that the enactment by Oklahoma of the Uniform Partnership Act alters this common law rule. See Okla. Stat. Ann. tit. 54 218(c) (West 1988).[8] This conclusion, however, is uncertain. See, e.g., 59A Am.Jur.2d 1016 (1987) (relevant section of U.P.A. accords "with common law which held that an advance was a loan on which interest is payable").
 
 
 22
 It is unnecessary, however, for this court to explore in this case the subtleties of this aspect of Oklahoma's partnership law. Mr. Johnson's testimony at trial indicates that the Johnsons had, in fact, agreed to characterize satisfaction of the $1,000,000 obligation as a capital contribution by Mrs. Johnson and had, furthermore, agreed to forgo interest. See, e.g., Cross-aplt. Supp.App. at 15 ("[I]n other words, I could pay it [the $1,000,000 debt] any time as I saw fit, and it would be added to my wife's capital account." (testimony of Mr. Johnson)); id. at 36 ("I would get credit for it [satisfaction of the $1,000,000 obligation] on the capital account, but I wouldn't draw interest." (testimony of Mr. Johnson)). Thus, Mrs. Johnson plainly falls within the common law rule enunciated in Harris v. W.H. Hart & Co. rather than the exception set forth in 218(c). The trial court properly refused to award prejudgment interest.
 
 
 23
 We AFFIRM the decision of the district court for substantially the reasons given by the trial court.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November29, 1993. 151 F.R.D. 470
 
 
 [2]
 Honorable Frank G. Theis, Senior United States District Judge for the District of Kansas, sitting by designation
 
 
 [3]
 The various Johnson family businesses share a common bank account. Thus, no cash actually passed from Susanna Johnson to Johnson Farms. However, the Johnsons have stated during this litigation that they consider the partnership's debts to Johnson Farms to be paid
 
 
 [4]
 The court derived its figure by subtracting approximately 500 cattle known to have been obtained in other transactions from the number of cattle on the Honey Creek Ranch as of 1975. See Cross-aplt. Supp.App. at 115-22, 123-24 (roughly 150 head of cattle on ranch at time of acquisition by partnership); Aplt. Reply Brief at 6 (200 head of cattle shipped to ranch from Florida); Finding of Fact 12 (200 head of cattle sold to partnership by Johnson Farms in 1973); Cross-aplt. Supp.App. at 125-26 (roughly 1900 head of cattle on ranch as of September, 1975). Thus, approximately 1900 minus 550 (200 % 150) is roughly 1400. The court's calculations are corroborated by the shipping records (which count ear tags of shipped cattle) offered at trial. See Aplt. Supp.App. at 63 (1400 non-duplicative numbers recorded)
 
 
 [5]
 See, e.g., Cross-aplt. Supp.App. at 67, 117-26. The value calculated by the court is roughly the same as the basis attributed to these cattle for tax purposes
 
 
 [6]
 Indeed, the Tax Court eventually found at least one aspect of the $5,000,000 sale to be a sham transaction. See Johnson v. Commissioner, 62 T.C.M. (CCH) 254 (1991)
 
 
 [7]
 It must be remembered that Mrs. Johnson acted both as a partner within the partnership and as a representative of Johnson Farms. Thus, delivery to the Johnsons is indistinguishable from delivery to Johnson Farms. Under the circumstances, it could hardly be argued that the continued presence upon the financial statements of the debt did not constitute a written, authorized acknowledgment of the debt
 
 
 [8]
 "A partner, who in aid of the partnership makes any payment or advance beyond the amount of capital which he agreed to contribute, shall be paid interest from the date of the payment or advance."